UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

TERRI MARSHALL,

                              Plaintiff,

                                                                       DECISION AND ORDER

-vs-

                                                                         05-CV-6438 CJS

PENNSYLVANIA LINES, LLC,
c/o Norfolk Southern Railway Company

                              Defendant.

_____

## INTRODUCTION

This negligence action, based upon diversity jurisdiction and controlled by New York law, was tried before the Court without a jury on October 23, 2006. Both plaintiff, Terri Marshall, and her husband, Andrew Marshall, testified at trial. The only other testimony presented was the videotaped examination of plaintiff's treating physician, Dr. Kevin Coughlin. The Court, having considered the testimony of the witnesses and exhibits received into evidence, now, pursuant Fed. R. Civ. Proc. 58 (c), makes its Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

As of the date of trial, plaintiff, Terri Jo Marshall was forty-eight years old. She was married to Andrew Marshall and lived at 708 Chester Street, Elmira, New York. She was employed as a medical transcriptionist and had been so employed for approximately eight years. As of September 1, 2004, she was employed in that capacity by Medquest.

Prior to September 1, 2004, plaintiff engaged in a number of activities. She did aerobics at home a few days a week. Additionally, she used video tapes to do weight training at home. She liked to run and play badminton and tennis, and she also liked to go to the mall, dance, and play with her five grandchildren. Around the house, she did the laundry, cooking, cleaning, shopping, and mowed the grass. Moreover, she tried to walk every day, or as much as she could, to relax and relieve stress. In any given week, plaintiff would walk at least four out of seven days.

Furthermore, prior to September 1, 2004, plaintiff did not have any problems with her left leg, left knee, or left pelvis, nor did she have any pain in her lower back. However, she did have a problem with bladder control, and on occasion experienced urgent incontinence, and, when it occurred, she would have to relieve herself as quickly as possible. Prior to September 1, 2004, though, she had not experienced the condition while out walking.

On September 1, 2004, plaintiff went for a walk, wearing flip-flops, between 10:00 p.m. and 10:30 p.m. Although it was dark out, it was a nice evening for a walk. Plaintiff proceeded down Chester Street, and walked about two blocks to Pine Street where she turned right. She then proceeded on Pine Street for approximately a block to the intersection of Franklin Street, where there was a traffic light. She crossed Franklin Street and continued for another block to Perine Street. She turned right onto Perine Street, walked a long block until she came to South Avenue, and then turned left. She proceeded on South Avenue for about four blocks, crossed over Pennsylvania Avenue, and walked down a long block to Main Street. She crossed over Main Street and continued on South Avenue for another long block until she came to Clements Parkway, which is a four lane divided highway with a traffic light. She crossed Clements Parkway, and walked on the

sidewalk on the left hand side of South Avenue, facing traffic. She continued to a railroad underpass, which is about twenty feet beyond the intersection of Clements Parkway. The railroad tracks pass above South Avenue.

When plaintiff arrived in the area of the railroad underpass, she experienced an urgent need to urinate. The closest facility with a bathroom was the High Bar, which was located a couple of blocks behind her on South Avenue. Based upon the urgency to relieve herself, it would have taken plaintiff too long to return there. She looked for a private area to relieve herself and observed a path off to her left, adjacent to the sidewalk on South Avenue, where she noticed some bushes and trees. By stipulation of the parties, the path was on land owned by the defendant, Pennsylvania Lines, LLC c/o Norfolk Southern Railway Company. Although it was dark out and she had never been on the path before, she was able to see it because of some small lighting offered by the underpass. The path, which was wide enough to accommodate two people, was about 17 feet across and had a slight grade to it, leading up to the railroad embankment. There was no sign prohibiting or fence obstructing her ability to enter onto the path.

Plaintiff proceeded up the path some distance and then stopped to relieve herself. However, a car then turned onto South Avenue from a side street and headed in her direction. She reacted to the car lights by proceeding farther up the path. Then all of a sudden, approximately 108 feet along the path, as measured from the sidewalk on South Avenue, she fell off a ledge. It was very dark in the area where this occurred and when this happened she was hurrying, not paying attention to the ground. She in fact fell three feet off a concrete structure which traversed the path. It was about 11:00 p.m. when plaintiff fell. After falling, she tried to get up, but was unable to do so. She then called her husband,

Andrew Marshall, using her cell phone. She was screaming and told him that she thought that she had broken her leg. Plaintiff's husband asked her to tell him were she was located, and she tried to describe for him where she was. After he told her he would get her help, she hung up with him and called 911. The 911 operator told her to keep hollering until she heard someone coming. At that point she wasn't in pain, just scared.

Plaintiff's husband arrived in the vicinity where she had fallen just before the Fire Department. She heard emergency vehicles arriving and her husband shouting, however they were unable to actually locate her, so she called her husband again on her cell phone. The area where she had fallen was thick with over growth. Plaintiff's husband had to break bushes apart to get to her. Ambulance personnel arrived about 11:30 p.m. When they tried to move plaintiff, she could feel the bones in her leg as if they were rubbing together. Plaintiff was then screaming in pain. Her husband observed a bone sticking out of her leg. She was transported to the Emergency Department at St Joseph's Hospital in Elmira, New York.

When plaintiff arrived at St. Joseph's, she was in severe pain and the bone in her left leg was still protruding. Once at the hospital, she began asking for pain medicine. She was seen by an orthopedic specialist, Dr. Kevin Coughlin. Dr. Coughlin examined her, diagnosed a grade one compound or open fracture to plaintiff's left tibia[1], and determined that it was going to require operative stabilization. However, Dr. Coughlin decided not to perform surgery at that point, since plaintiff had recently eaten, and he believed it advisable

---

[1] A grade one fracture is least severe or lowest grade.

to allow the food to digest over the next day before operating. The type of fracture that plaintiff sustained is very painful, and, while she was being treated in the emergency room she was screaming.  That night she was given antibiotics intravenously to prevent infection and was also administered narcotics intravenously for pain.  The next day, September 2, 2004, she was stressed, uncomfortable, and experienced swelling in her leg.

On that same day, September 2, 2004, her husband returned, during the daytime, to the location on the path where plaintiff fell. He observed what appeared to be the letters "B," "G," and "A" spray painted on the concrete structure from which his wife fell, as well as black and blue graffiti painted on the structure. In the area below the drop-off he also saw a hubcap hanging from a tree and a considerable number of beer and soda cans and wine and whiskey bottles. Approximately fifty years ago, the area where plaintiff fell was fenced in, and included the American LaFrance Ice Company, that apparently utilized the path to load ice onto trains.

On September 3, 2004, Dr. Coughlin performed surgery on plaintiff. He stabilized the fracture with an intermedullary device, a metal rod, and then applied a cast. Following the operation, plaintiff was continued on medication for pain. On September 5, 2004, she was discharged from the hospital. She could not bear weight on her left leg and was given a wheel chair and crutches to assist her. However, she did not feel comfortable enough with the crutches to use them.  When she returned home, special accommodations were required. Her husband set up her bedroom, which was on the second floor, like a hospital room. He put in a porta-potty and had everything, including her medications and drinks, accessible to her on a tray.  The porta-potty was needed because the hallway on the second floor was too narrow to allow her access to the bathroom using the wheelchair. He also set

up an office for her on the second floor.

Upon returning home, she had difficulty sleeping, because she was afraid of getting a blood clot which, her doctor had informed her, could potentially occur and could potentially be fatal. After her surgery, she was unable to engage in any of her regular activities, and she remained in her wheel chair for approximately two months. It was necessary for her to take Vicodin regularly for a period, although she does not recall for how long. After that, she took Vicodin off and on until approximately February of 2005. In addition to the Vicodin, she also took and continues to take Motrin as a result of pain. Subsequent to her surgery, she began experiencing pain in her left knee which has continued to the present.

In the middle November of 2004, plaintiff discontinued using a wheelchair in favor of a walker. Moreover, in November 2004 she resumed working as a medical transcriptionist, although not to the extent that she had prior to her injury. In the beginning of December 2004, she was able to use a cane instead of the walker. She used the cane until February of 2005. It was also in February of 2005 that her pain started to decrease and she was able to resume some of her previous activities. Then, in March of 2005, she was able to resume working as a medical transcriptionist to the same extent, twenty hours per week, one hundred lines per hour, as she had prior to her injury.

Once plaintiff began using the walker, she was able to be downstairs more with her family and do minor things, such as load the dishwasher and cook a small meal. However, she was not able to do any housework or grocery shop, and still had to maneuver on her behind to get up and down the stairs. Once she started using the cane, though, she was able to do almost everything inside the house that she had done before her injury, except carrying heavy items up from the cellar. Then upon discarding the cane in February of 2005,

plaintiff was able to resume driving a car. However, when she discarded the cane, she could only walk for about 10 to 15 minutes before her leg would start to swell. Moreover, she was unable to resume her daily walks or resume aerobics. She was able, though, to work out and strengthen her upper body, resulting in her ability to ride a bicycle and then eventually her ability to walk longer than 10 to 15 minutes.

As of the date of trial, plaintiff remained unable to engage in certain activities that she had pursued before September 1, 2004. For example, although she loved to dance, she can not dance anymore. Also, she can not run at all, or play badminton or tennis, nor can she mow the lawn as she did prior to her injury. Occasionally, her left knee and left calf will start hurting and if she is on her left leg too long it will swell. Also, her left hip and pelvis bother her from time to time and cause her to experience a burning sensation, which she never felt before September 1, 2004. Moreover, after her fall, she started having lower back pain, as a result of which she has become limited in her ability to shop and walk in the mall, and play with her five grandchildren like she did previously by picking them up and by giving them pony rides. Furthermore, she still can not walk for more than 15 minutes without experiencing pain, while prior to September 1, 2004, she could do so for over an hour pain-free. In addition, as a result of her fall, she has a three inch scar on her left knee and a bump on her ankle where the bone came through the skin, which causes her discomfort.

Dr. Coughlin followed up with plaintiff on September 13, 2004. He changed her cast on that date and also had an x-ray taken of her left leg. The x-ray revealed that the fracture was well aligned, although there was no healing yet. Dr. Coughlin saw plaintiff again on September 29, 2004, October 15, 2004, and November 2, 2004. On those occasions, he concluded that she was doing reasonably well. After November 2004, Dr. Coughlin continued

to see plaintiff on a regular basis until he determined that the fracture to her left tibia had actually healed. While the fracture had, in all likelihood, healed by late summer of 2005, an x-ray Dr. Coughlin ordered on the occasion of plaintiff's last office visit on September 22, 2006, irrefutably established that, as of that date, the fracture was completely healed. However, she continued to have problems in three residual areas proximately caused by the fracture. First, as a result of the fracture, her left leg was eight-tenths of an inch shorter than her right leg, which can cause lower back and pelvis pain. Dr. Coughlin prescribed a shoe lift in an attempt to address this issue. Second, she has a bump on her lower left shin due to healing bone protruding into the soft tissue in that area. The condition is largely cosmetic and correctable by outpatient surgery. Finally, as revealed by an MRI, taken on September 22, 2006, she has a meniscal tear in her left knee, which can also be corrected by outpatient surgery. The total cost of surgery to repair plaintiff's torn meniscus would be approximately $6,000.00.

By stipulation of the parties, plaintiff lost $1,077.52 in earnings due to her injury and sustained $17,057.84 in medical expenses[2].

## CONCLUSIONS OF LAW

Is well settled that, under New York law, a landowner has a duty to maintain its property in a reasonably safe condition. Where an injured party proves by a preponderance of evidence that an unsafe condition existed on land, that the unsafe condition was caused by the landowner or that the landowner had actual or constructive notice of it, and that the unsafe condition was the proximate cause of injury, then such party is entitled to recovery.

---

[2]Subject to a lien.

*Hanley v. Affronti*, 278 A.D.2d 868, 869 (N.Y.A.D. 4th Dept. 2000). "To constitute constructive notice, a defect must be visible and apparent and it must exist for a sufficient length of time prior to the accident to permit [defendants] to discover and remedy it" *Gordon v. American Museum of Natural History*, 67 N.Y.2d 836, 837 (1986); *Morrow v. Ashley*, 3 A.D.3d 619, 620-621 (N.Y.A.D. 3 Dept.,2004).

The duty owed by a landowner does not depend upon whether the injured party is an invitee, licensee or trespasser, and a landowner has a duty to maintain its property in a reasonably safe condition whether the property is open to the public or not. *Basso v. Miller*, 40 N.Y.2d 233, 240 (N.Y. 1976); *Peralta v. Henriquez,* 100 N.Y.2d 139, 143 (N.Y. 2003). In other words, a landowner owes a duty to another who comes onto his land, whether invited or not, to keep it in a reasonably safe condition, considering all of the circumstances including the purpose of the person's presence and the likelihood of injury. *Macey v. Truman*, 70 N.Y.2d 918, 919 (N.Y.1987). Consequently, even if the injured party came onto the land uninvited or was a trespasser, the landowner still as a duty of due care to such individual as long as his presence was reasonably foreseeable.  In deciding the question of the foreseeability of the injured party's presence, various factors must be considered, including whether the property was located near populated areas, the ease or difficulty with which people could enter the property, the frequency and duration of prior trespasses, and whether the landowner was aware of any prior trespasses. New York Pattern Jury Instruction ("NY PJI") 2:90.

Moreover, although there is no duty to warn of an open and obvious condition, that principle does not absolve the landowner of the duty to maintain its property in a reasonably

safe condition, *Juoniene v H.R.H. Const. Corp.*, 6 A.D.3d 199, 201 (N.Y.A.D. 1st Dept., 2004). As the New York Appellate Division Third Department explained in *Cohen v. Shopwell, Inc.,* 309 A.D.2d 560, 562 (N.Y.A.D. 3rd Dept. 2003).

> T]he duty to maintain premises in a reasonably safe condition is analytically distinct from the duty to warn, and that liability may be premised on a breach of the duty to maintain reasonably safe conditions even where the obviousness of the risk negates any duty to warn.

*Id.* at 562, citing *MacDonald v. City of Schenectady*, 308 A.D.2d 125, 128-129 (N.Y.A.D. 3rd Dept. 2003). When that duty has been breached, the fact that the unsafe condition may have been open and obvious does not eliminate liability, but rather raises an issue of fact concerning comparative negligence, *Sportiello v New York*, 6 A.D.3d 421, (N.Y.A.D. 2nd Dept. 2004).

In *Holl v. Holl*, 270 A.D.2d 864 (N.Y.A.D. 4th Dept. 2000), the New York Appellate Division Fourth Department offered this guidance on what constitutes a dangerous condition:

> Supreme Court erred in granting that part of the motion of Geraldine A. Holl (defendant) for summary judgment dismissing the complaint against her. Plaintiff, defendant's daughter, was injured when she tripped on a threshold and fell. Defendant employed defendant Daniel Stanley Kowal, d/b/a Kowal Konstruction (Kowal), to build an attached garage and install a new doorway leading from the garage into the house. As constructed, the doorway had an interior threshold that protruded upwards approximately 3 1/2 inches from the floor of the house. Although we agree with defendant that she had no duty to warn plaintiff of the open and obvious condition (*see, Hopson v. Turf House*, 252 A.D.2d 796, 797, 676 N.Y.S.2d 256), plaintiff alleges that defendant breached her duty to maintain her property in a reasonably safe condition. "The fact that the [raised threshold] was readily observable goes to the issue of comparative negligence and does not negate the duty of defendant [ ] to keep [her] premises reasonably safe" (*Crawford v. Marcello*, 247 A.D.2d 907, 668 N.Y.S.2d 852). The 3 1/2 inch-high threshold is not "trivial" as a matter of law, and whether it constituted a dangerous or defective condition is an issue of fact for the jury (*see, Trincere v. County of Suffolk*, 90 N.Y.2d 976, 665 N.Y.S.2d 615, 688 N.E.2d 489).

*Id.* at 864.

It is true that New York law provides that:

> . . . an owner, lessee or occupant of premises, whether or not posted as provided in section 11-2111 of the environmental conservation law, owes no duty to keep the premises safe for entry or use by others for hunting, fishing, organized gleaning as defined in section seventy-one-y of the agriculture and markets law, canoeing, boating, trapping, hiking, cross-country skiing, tobogganing, sledding, speleological activities, horseback riding, bicycle riding, hang gliding, motorized vehicle operation for recreational purposes, snowmobile operation, cutting or gathering of wood for non-commercial purposes or training of dogs, or to give warning of any hazardous condition or use of or structure or activity on such premises to persons entering for such purposes;

New York General Obligations Law § 9-103(a). However, as the New York Appellate Division Second Department explained with respect to § 9-103(a):

> . . . the Court of Appeals has held that merely engaging in an enumerated activity is not, in and of itself, sufficient to invoke General Obligations Law § 9-103 *(see, Iannotti v. Consolidated Rail Corp.*, 74 N.Y.2d 39, 544 N.Y.S.2d 308, 542 N.E.2d 621). Instead, in order to determine whether the property in question falls within the statute, the court must look to whether the property is "physically conducive to the particular activity or sport" as well as whether it is the "type which would be appropriate for public use in pursuing the activity of recreation" *(Iannotti v. Consolidated Rail Corp.*, supra, at 45, 544 N.Y.S.2d 308, 542 N.E.2d 621).

*Ackermann v. Town of Fishkill* 201 A.D.2d 441, 442-443, (N.Y.A.D. 2nd Dept.1994).

Applying these principles of law to the above-stated findings of fact, the Court determines that plaintiff has proven by a preponderance of evidence that defendant was negligent and that defendant's negligence was a proximate cause of her fall on September 1, 2004, and of the resulting injuries she sustained. In that regard, the Court concludes that the concrete structure which traversed the path on the land owned by the defendant and which caused a three foot drop was an inherently unsafe condition. The Court further concludes that, based upon size, shape, and obvious age of the concrete structure (see

Exhibits 8,9,10, and 403) it was obviously man-made and took some time to construct, and therefore, it is reasonable to infer that defendant, as landowner, is responsible for its creation. Alternatively, based upon the size, shape, and obvious age of the concrete structure (again see Exhibits 8,9,10, and 403), the Court concludes that defendant had at least constructive notice of the unsafe condition. Moreover, the Court determines that the presence of plaintiff or someone like her on the path was foreseeable to defendant based upon the following: the path was located in a populated area; it was adjacent to a sidewalk that accommodated pedestrian traffic; no fence or obstruction of any type prevented access to the path; no sign advised persons to stay off the path; and the path had obviously been used by others, as shown by the presence of discarded beer and soda cans, wine and whiskey bottles, and graffiti in the area immediately below the drop-off. The Court also concludes that the nature of the sudden drop on the path made it foreseeable to defendant that falls, such as the one plaintiff experienced on September 1, 2004, could occur. Finally, the Court determines that, despite defendant's contention to the contrary, New York General Obligations Law § 9-103(a) is inapplicable to this lawsuit for two reasons. First, the Court concludes that plaintiff was not engaging in an enumerated activity, *i.e.* the Court finds she was not hiking, as argued by the defendant. Second, the Court concludes that § 9-103(a) does not apply, since no evidence was adduced to establish that the property in question was physically conducive to hiking.

     On the other hand, the Court finds by a preponderance of evidence that defendant has proven that plaintiff was also negligent and that her negligence was a proximate cause of her fall and resulting injuries. In reaching this conclusion, the Court considered a number of factors. First, despite the fact that it was dark out, plaintiff entered onto a path on which

she had never previously been. Second, the path was populated with trees and bushes and thick with overgrowth. Third, plaintiff was wearing flip-flops, which at best provide limited footing and traction. Finally, and most significantly, although it was very dark in the area where plaintiff fell, when the accident occurred she was hurrying and not paying attention to the ground.

Having found both plaintiff and defendant liable for the accident and plaintiff's injuries, the Court must next apply New York law on comparative negligence. Specifically, the Court must weigh all the facts and circumstances of the accident, consider the negligence of both plaintiff and defendant, and then assign a percentage for each party's fault with the total equaling 100%. N.Y. PJI 2:36. The Court does so and apportions fault as follows: defendant-30%; and plaintiff-70%.

Turning now to damages, the Court, based upon stipulation of the parties, determines that plaintiff sustained a total loss of $17,057.84 for past medical expenses, and additionally, based upon its Findings of Fact, determines that plaintiff is entitled to a total award of $ 6,000 for future medical expenses in anticipation of arthroscopic surgery to repair the torn meniscus on her left knee. Further, the Court finds, again, based upon stipulation of the parties, that plaintiff sustained a total loss of earnings in the amount of $1,077.52.

As to pain and suffering, the Court considers the fracture to plaintiff's left tibia and the effect it had on plaintiff's life, including her ability to engage in activities she enjoyed before September 1, 2004. The Court also considers the residual effects of this injury: the fact that her left leg is permanently eight-tenths of an inch shorter that her right leg, a condition which causes her lower back and pelvis pain; the fact that she has a three-inch scar on her left knee; the fact that, although correctable by surgery, a bump remains on her lower left shin

due to healing bone protruding into the soft tissue in that area causing her some discomfort; and the fact that she experiences pain in her left knee due to a torn meniscus, although this condition, too, is correctable by surgery. After due consideration, the Court concludes that plaintiff is entitled to a total award of $125,000 for past and future pain and suffering.

Since the Court has determined that plaintiff is 70% at fault, she is entitled to recover the following amounts:

medical expenses-$6,917.35 ($17,057.84 [past] + $6,000.00 [future] x .30);

loss of earnings-$323.26 ($1,077.52 x.30);

pain and suffering (past and future)-$37,500 ($125,000 x .30).

## CONCLUSION

Accordingly, it is the judgment of the Court that plaintiff be awarded $6,917.35 for medical expenses, $323.26 for loss of earnings, and $37,500 for pain and suffering, for a total award of $44,740.61.

It is So Ordered.

DATED:　　　February 5, 2007

　　　　　　　　　　　　　　　　/s/ Charles J. Siragusa
　　　　　　　　　　　　　　　　CHARLES J. SIRAGUSA
　　　　　　　　　　　　　　　　United States District Court